Mr. Francis. Yes, thank you. Good morning, Your Honors. May it please the Court, Jim Francis for the appellant, Amy Summers. With me is my co-counsel, Micah Atkins. The issue before the Court is whether a credit reporting agency that chooses to place and include credit inquiries in a consumer's file yet deliberately fails to investigate consumer disputes has a reasonable reading for failing to comply with the FCRA based upon Safeco and this Court's ruling in Levine. Respectfully, the answer is no for three reasons. First, the statutory is clear. It is not ambiguous like the terms were in Safeco and Levine. The statute requires that Equifax investigate a dispute of a consumer of any item of information contained in the consumer's file. The clarity of the statute is only underscored in this case by the fact that, as a matter of fact, and what the record demonstrated here was that Equifax includes inquiries in consumer files. So, this is not a case where the Court need look at the other provisions of the FCRA. Counsel, let me ask you a question about understanding the operation of the statute. When I look at the entire statute and the use of items of information, there is, as I read the statute, there is one of the alternatives that may be taken by the agency. They may just delete on a complaint of the consumer or an inquiry. They may delete an item of information. In other words, the fact that someone has asked for the report and including that, they can delete that and then, for the investigation, they can reinsert it. But if you read through the process of the notice of reinvestigation and how this works, the fact that somebody made inquiry doesn't quite work. I don't know how they go back to the person who made the inquiry to verify you made the inquiry. It's very awkward in the structure of the statute. I don't, we don't think necessarily that it is, Your Honor. Their own witness admitted that the system that they used to investigate, the eOSCAR system, could be configured to notify companies who made inquiries and it could be done. And as I think, Your Honor. Well, it's not it could be done. It just doesn't make sense. I'm looking at the statute. It says, after any reinvestigation of the earlier paragraph, any information disputed by a consumer, an item of information is found to be inaccurate or incomplete, cannot be verified. The consumer reporter shall promptly delete the item of information or modify the item of information, etc., etc. Then, it is, the procedure is then for reinsertion of the information that seems kind of awkward. Your Honor, the reinsertion provision is not before the court? Jones Corporation has made an inquiry and asked for the report. So, they call, so they delete the Jones information. They call Jones Information and say, we have, you made an inquiry here. Did you make an inquiry? And they're looking at the reinserted then. Well, Your Honor, the way it would work is the consumer would dispute that I didn't make any inquiry. Here is my information. Here's my driver's license. I think the question, though, is, of course, the consumer didn't make the inquiry. That's not how it happens. Somebody, DirecTV, made the inquiry. The implication being, although not necessarily true, the implication being our business, our credit card, or whatnot, but that's not what the actual indication of the file is. It's that there was an inquiry by DirecTV, is it not? It is not, Your Honor. In fact, their own witness acknowledges that an inquiry relating to identity theft is not an accurate entry in the file. That's not what I'm asking. What does the actual entry on the report indicate? That that consumer, the subject of the report, applied for credit. I can't imagine that. I can't imagine that anybody would know that that consumer had applied for credit as opposed to that consumer was negotiating with somebody over the purchase of a car and they ran a credit report on them. Well, Your Honor, I would say that a credit report, by definition, and as outlined in our briefing, pertains to that person's transactions, not other people's transactions. I know, but it doesn't mean that the consumer actually applied for credit. They may have been negotiating and he wants to know what kind of credit history they've got. So, can I offer him this installment plan or not? At least I don't think it's in this record that the consumer has to authorize an inquiry into the credit agency. Am I wrong about that? It depends, Your Honor. If the consumer's applying for credit, that is one basis for a company to pull a credit report. There are other bases as well. I think one of the... And they all have the same effect on the credit history? No, Your Honor. Only what's called hard inquiries affect the credit score, not a soft inquiry. A soft inquiry, for example, would be an account review where an existing creditor of the consumer is looking at the account. But applications for credit are considered hard inquiries and they reduce the person's score because it's considered that the person might be applying for a lot of credit and their amount of indebtedness, it's uncertain. So, it's a risk factor for creditors to see somebody applying for a lot of credit. So, that's why it drives down the credit score. So, only those scores that... Only those applications that come from that particular consumer are ones that will affect the credit score. Actually, that's not true. It's inquiries that come from a creditor about that particular consumer, is it not? It is not, Your Honor. It's only when it's... So, if DirecTV gets something out of the newspaper online about who attended a museum fundraiser and said, these folks are potential customers of ours, let's check their credit and see if we should offer them that. That doesn't count against the credit history? Correct, Your Honor. In fact, that's what's called a promotional inquiry. And promotional inquiries can only be made when the company is going to make what's called a firm offer of credit. So, they can't just shop around and look at people's credit reports to determine whether they want to make them a loan unless they make a firm offer of credit. So, the idea behind the hard inquiry is this person is applying for credit and they might be indebted. So, the purpose of the accuracy on the report is that the inquiries relate to that consumer and not somebody else. I would also point out that it is not a question in this case whether or not inquiries were part of Equifax's file. They admit that, that it was part of the file. So, under Section 1681I and the plain reading of it, it has to be investigated if it is an item of information. If the court finds that an inquiry is not an item of information, then it does not have to be investigated. But we would assert respectfully that there is no way to read item of information to exclude inquiries, as the district court found. But what about their argument about 1681GA? I believe it is. Upon request, the Consumer Reporting Agency must disclose all information in the consumer's file. Yes. Alternative, alternative, alternative, and identification of each person that procured a consumer report. Why isn't that redundant under your view? Why it's not, number one, because as I know factually that Equifax put inquiries in the file. So there is no need to look at that, but I'm happy to discuss that. No, no. It's a question of, it's a question of statutory interpretation about whether that includes identification of people who requested it. If they say, her argument is that indicates that identification of each person that procured a of all information in the consumer's file. Regardless of what common sense may indicate, the statutes indicate, the statute says here, all information in the consumer's file and information about who procured the report. Yes, I understand your honor. I think I can explain it. If you look at the definition of file, the definition of file in the FCRA is all information that is retained or recorded by the Consumer Reporting Agency. It is not categorical, meaning that it is not a definition that says these five pieces of information are in the file. It's whatever the... Put it, put it, and I thought what you were going to say is you don't have to put this in a file. That's correct. You can choose to or not to. That's why they have the alternative, because even if you don't put it in the file, you've got to disclose it if the consumer asked about it. That's correct, your honor. But then how would you know it if you don't put it in the file? You don't put it in the file. Will you put it in the desk drawer? Of course not. So, how can you have something that you must disclose that's not in the consumer's file? How do you, you have a master log of all inquiries about consumer credit? Well, I think what the statute is saying is even if you, Consumer Reporting Agency, don't record these inquiries, you must disclose them to the consumer. You mean disclose them as you go along? No, meaning, your honor, that there's a... How do you have them to disclose? If the consumer writes and says, give me all the inquiries into my report, and you write back and said, we can't remember. Sure. I think I could explain it, your honor. So, the file itself is all of that person's credit information and their personal identifying information. So, that file's here. Separately, the company is getting requests for that information, and it records it in database Y. Okay. What the FCRA is saying is, you have to give them not only the information you keep on the consumer, but also the Y inquiries. Here, we know for a fact that, because that affects it, they actually put the inquiries in the file. So, we think this is largely academic, but regardless... I'm sorry. Is there another way also to construe it as possibly those enumerated categories, just setting forth five categories of all information that's in the consumer's file? Well, I think Judge Carnes, I think his analysis was correct in the sense that the statute, the Section 681G is referring to, if you don't include this in the file, you still must disclose. Okay? These are the information... I understand, but I'm just saying, is there possibly another way to construe that? I don't see another way to construe it. I think the issue that would be raised, not in this case, but potentially another case where the CRA made the argument that inquiries were not on the file is, would they need to be investigated under I? That's a different issue, and I don't know that that's before this court. But what's before this court is a factual record that the inquiries were in the file, and they were items of information, and they needed to be investigated. The only authoritative or interpretive agency guidance on this also agrees with our reading and the district court's reading, which is that inquiries, challenges, or disputes about inquiries that are unauthorized have to be investigated. The FTC is the only agency that was deputized at that time with any guidance under the FCRA, and it found, exactly as we're saying, that they are items of The FCC themselves didn't find that. That was a staff report, wasn't it? It was a staff report, Your Honor. Yes, that's what I meant to say. But I would also argue that there's another reason why they don't have an objectively reasonable reading for a willful defense, and that is Equifax brought this problem on itself. All right. As the court is aware, if you look at the, for example, the March 13, 2013 file disclosure results that Equifax sends Ms. Summers, it tells her, enclosed is a copy of your Equifax credit file. Please review it for any unauthorized accounts or inquiries. If they weren't going to investigate inquiries, why are they telling consumers to dispute those inquiries? So they undertook the duty. This is not a Safeco or a Levine case where a defendant or a company was warned away from complying with the statute because it didn't understand the statute. They undertook the duty, and they, as a result, they cannot, I think, in good faith claim an objectively reasonable reading defense when they were the one who encouraged these disputes in the they didn't know what their duty was. Equifax used to delete all these inquiries back in 2008. It did. It complied with Section 681I. It decided for whatever reasons, business reasons or otherwise, that we're not doing this anymore, and there's some of that in the record. When you say all these inquiries, you mean the unauthorized ones? Well, disputed inquiries, that they had a policy of removing disputed inquiries at one point, and then they moved away from that. So they clearly were aware that the statute put them on notice, and in the testimony, their reasoning was that they were getting criticism from some of their companies that they were just getting a lot of feedback and they were getting some fraudulent and frivolous disputes, which sometimes happens, and they stopped that policy as a result. But that's not a Safeco defense. They might, at trial, be able to argue that we weren't reckless because it was impossible. We had difficulties complying. We were getting flack, and it cost us a lot of money. That's a Garden-Verily reckless defense. That is not a Safeco. I don't understand the law, but I have safe harbor. Okay, Mr. Francis, I'll let you run over. We'll hear now from Ms. Sumner, and we will give you your three minutes. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Phyllis Sumner here on behalf of Equifax Information Services, LLC, and I have with me Marissa Malik, who is my co-counsel on this matter. Why don't you start with his question, Ms. Sumner? Well, it's not the major issue, but why tell her to check for unauthorized inquiries if it doesn't matter? They're not going to do anything about it. I don't think that's accurate, Your Honor. I think that there is a process in place for place that if the subscriber then contacts Equifax and says, we made an error, she was not the person we meant to actually access, then Equifax will take action. There is a process here. There is a different reinvestigation process. But if they respond and say, we meant to inquire about her because we didn't know this jerk had stolen her identity, you don't do anything about that, right? I don't think that's correct, Your Honor. If there were accounts that went on her credit file... No, no. I thought it was undisputed that authorized inquiries, authorized by the consumer whose report you have or made, genuinely made, it damages the credit or can damage the credit, her credit. You haven't disputed that so far, have you? Well, we would certainly dispute whether it damaged her credit because there is absolutely no evidence that it had any impact on her credit score. We're going to focus, if it takes all of your argument on this, you have acknowledged that false statements about authorized inquiries or accurate statements about authorized inquiries can adversely affect a consumer's credit score. A hard inquiry, Your Honor. Hard inquiry. That's what we're talking about here. All right. So when she says, I didn't do that. Somebody stole my identity. Your company's position is tough. We don't investigate that because the creditor actually asked us under the false impression that it was somebody else to make a... The creditor actually under the false impression somebody else made a hard inquiry and that's all. That's your position. The position of the company is twofold. One is that the fact that that subscriber accessed the credit file is accurate. So that is the position of the company. And you don't care whether they did it under false pretenses from somebody who'd stolen the consumer's identity or not. Your Honor, I don't think it's fair to say that the company doesn't care. Well, if the company cared, then the company would investigate and determine whether that was accurate and take remedial measures. But for whatever reason, and when I say don't care, I'm talking about economic reasons. Y'all had rather not do that. It's too much of a bother. And if that damages the consumer, that's not your fault. That's not your problem. You just chug along in business with that false information, implicitly false information in the file. Your Honor, I don't agree with the description that you provided. I agree with the fact that there was a different reinvestigation process. If you had a video, you had a 60 minutes report, 20 minute segment showing that this woman's identity had been stolen and that DirecTV, et cetera, would not have made the inquiries had they known that. And everybody agrees that the inquiry shouldn't have been made. And they were only being made as a result of a crime against her. Your company's position is we do not change that information in the file. They have a process where sometimes that information is changed, Your Honor, and it very well might be in an unusual circumstance that you describe that Equifax may take those inquiries off the file. So there are times where the inquiries- What's unusual about my circumstances I described other than the fact that it was on TV and you got a lot of bad certainty that someone has stolen this woman's identity. And she tells you without dispute, I didn't apply for that. And your response is, as I understand it, at least we're here on the assumption that your response is, we don't care because literally all we're saying is that there was a hard inquiry from DirecTV. That's correct. We are taking the position that we are being literally accurate. Why would you want to do that? Your Honor, because it is a reasonable interpretation, or should I say it's not an objectively unreasonable interpretation of the FCR. You're telling me you can get away with it without having any legal repercussions, but why would you want to do that? You've got credit cards. Everybody who works for Equifax has credit cards, has a credit history and a credit report. Why would you want to do that? Because, Your Honor, sometimes information that's provided by the consumer needs to be addressed by the subscriber. The subscriber is in the best position to know whether or not they have the correct... You've taken the position that that's accurate and you're not going to change accurate information. So there's nothing DirecTV can do. No, that, Your Honor, is incorrect. DirecTV can contact Equifax and have that removed. So there is a process. It is a different process than the reinvestigation for furnishers. And as I'm sure you're familiar, there is an eOscar platform that is used for communicating back and forth with furnishers who provide information, the trade line information on the file, and there is that communication. There is not a similar industry-wide communication, as the CFPB and the FTC both are very well aware of, to communicate directly with subscribers in that way. So the process is handled differently, which means Equifax goes back to the subscriber. If the subscriber contacts Equifax and says, we were in error, then Equifax does have a process to remove that inquiry. So you're completely dependent on all credit disputes on the furnisher. So if DirecTV had submitted to you a report that this woman had missed four payments and they were on the following months, and she sends you cancel checks front and back, showing that no, she didn't, you're going with DirecTV, that she missed four payments. Not necessarily, Your Honor, because now you're in the furnisher reinvestigation process, which includes providing that documentation to the furnisher, but Equifax also takes a part in the investigation of that information. You just don't do that on who authorized the inquiry. It's a different process, Your Honor, and that's where we get back to whether or not Equifax's interpretation of the statute was objectively unreasonable, and I submit that it is not. If you look at the text, and I think Your Honor's even recognized that 1681 GA looks at inquiries differently. It does not include it in the definition of information in a consumer's file. So there is a recognition in this complex statute that it might be treated differently. No, it doesn't look at it as though you have to put it in the file. That's the correct interpretation. That's the clear correct interpretation. Stanley, interpretation makes sense. You can put it in there or not. That's up to you. You chose to do it. That means it can damage the consumer if it's inaccurate. Once you choose to put it in there, that's one thing. If you don't put it in her file, you've got a separate platform with all that in there. Then you've also got to disclose that. But if you just throw it away in the digital garbage can when it comes in, you don't have to disclose it because you don't have it. This is a fail-safe. If it's in the file, you've got to disclose it, everything. But if it's not in the file, you've got to disclose this part even though it's not in the file, these items even though they're not in the file. But of course, what you are suggesting is an entirely different process than the three national credit reporting agencies have set up at this time. And I come back to the standard, because it is whether or not the interpretation was objectively unreasonable. There is not much guidance on this. So we entered a decision saying this is the proper interpretation, Equifax is wrong. And from that day forward, it's a willful violation, right? That would have a different impact, Your Honor. But would that make it a willful violation? It would not. Your Honor, it would only be impacting companies going forward, which would have a huge impact on the entire credit reporting industry, which is not set up in that way, that is highly regulated by the CFPB, that has a process in place that they have regulated and addressed. And eOSCR took years to develop so that there can be communication between the have not asked them to do that. If our interpretation of the statute leads us to conclude that that's what the statute requires, I don't care if it affects every furnisher in America, if that's what the statute requires. I understand, Your Honor. And of course, I disagree with your interpretation of the in terms of what is that issue here and a willfulness determination, then we have to look at whether Equifax's interpretation was objectively unreasonable. And it was not, in light of the fact that this is industry standard, in light of the fact that all of the CRAs handle it in this manner, that they have constant interaction with the CFPB. Plaintiff cited one FTC report, but that report in and of itself recognizes that it is not binding authority. And it doesn't even deal with the specific issue. What that focuses on is when the subscriber inappropriately accessed, for example, because they had a fraudulent intent or they wanted to access information when they didn't have the right to do that. Here, the subscriber, based on the information provided to that subscriber, had a permissible purpose to access that file. So right now, Your Honor, for addressing whether or not the district court correctly found that Equifax did not act willful, Equifax had a reasonable and plausible interpretation of the FCRA. And we have provided five different ways in which Equifax's interpretation is supported by the language of the FCRA. And of course, many of those tie into this process of what is required of furnishers and the eOSCR communication platform. So we would submit, Your Honor, that it was reasonable and that Equifax's internal communications about this were not in any way bad faith, but in an appropriate manner to interpret. And of course, in... Let me ask you something, though. I mean, you did change the way that you did business. So at some point, you understood this. It seems like you may have understood this to require you to correct these kinds of inquiries. I don't think, Your Honor, it reflects that there was an obligation to correct it. I think it reflects an evolution of the company to address issues. And if there are disputes and they feel like... Well, I mean, it seems like it reflects an evolution of the company to cut its costs. I mean, it doesn't seem like... It seems like, why would you do it in the first place if you didn't think you had an obligation to do it? Well, because as times change and the electronic communication process changes, the company makes decisions about what it's required to do under the FCRA. How does one affect the other? Because the interpretation is that inquiries are not handled or that the company is not required to handle inquiries in the same way as disputed trade line information or account information. And in Your Honor's example, if the consumer had disputed account information... So let's say that the fraudster in this case had actually opened up a direct TV account, and that account hit per file, then there is a process to remove that along with the inquiry at that point. Let me put it to you this way. Can you point to anything specific either from CFPB or any kinds of changes or any kinds of regulations or anything that happened, I guess, around 2009 when you stopped doing this, that changed your position of how you construed the law? I don't think there's anything in the record, Your Honor, that would reflect that type of an analysis. When was the platform, Oscar platform, put online? Your Honor, I actually was trying to remember that this morning, and my memory failed me. I should know that off the top of my head. It has been online for many years, but I don't recall... 2009. I think it might have been after that point, Your Honor. And I can certainly check on that. If it's not in the record, I'm not sure that we should know it, but if it was before 2009, you know, that makes me wonder why you didn't change the... why you still had the process of doing it, of investigating these reports, and the whole credit reporting industry didn't come to its knees as a result of you doing that. Apologies, but I cannot answer that specific question. I understand. And I see that I've run out of my time, if I may conclude by just simply stating that on the record in this case, Ms. Summers did not suffer any harm as a result of this. Well, let me be clear. As I understand it, that Summers herself claimed to be a victim of identity theft. When she saw our credit report, she saw debt collection accounts of DirecTV and DISH Network. She then challenged those particular collection notices, etc. Those, all that report, all that was deleted, the only thing that wasn't deleted was the fact that I simply ordered her report. Is that correct? I think that's correct, Your Honor. But the bottom line is that she did not suffer any economic harm. It didn't impact her credit score, and she did not, in her own testimony, say that she had suffered emotional damages. If you have no further questions, then... I don't believe we do, Ms. Summers. Thank you, Mr. Francis. Thank you, Your Honor. I just wanted to respond to a few of the things that Ms. Summers mentioned. First, to be clear and to respond to a question from Your Honor, Chief Judge Karnes, what happened here, which was consistent with Equifax's practice, was on March 13th, Ms. Summers disputed these inquiries, among other things. That same day, almost instantaneously, she gets the results back that I outlined earlier. The testimony is clear. Nobody from Equifax looked at it. It was all generated by the computer. There was no investigation that was forwarded to the furnisher, so there was no way for her to get that inquiry resolved. There was some back and forth with Your Honor and Ms. Summers, and I want to make it clear. Their policy was, after 2008, unless they saw an inquiry that was in connection with investigating a credit account that was disputed as fraudulent, they would not remove or investigate inquiries. Period. That is the record. That is the deliberate position that they took. There might have been business reasons for that. And I think Your Honor hinted at that. And that might be. Companies make business decisions all the time. But the reality is here, there was no other means other than Ms. Summers going to the furnisher herself to possibly get this corrected. But the fact that, as Ms. Sumner said, that furnishers, if they did their own investigation, they could get the inquiry removed, that is of no import as far as we're concerned. The furnishers are their clients. So if their clients tell them, remove this information, they're going to remove it because they're hired by the client. I think what Your Honor was asking about earlier, which we obviously agree with, is, but what about the consumer? Certainly, the furnisher can get what it wants, but they have an independent duty under Section 1681I. All of the circuits that have looked at this issue found that the consumer reporting agency has an independent duty to delete or investigate, independent of whatever the furnisher does. So there are two different investigations that go on. This case pertains to a credit reporting agency's investigation. With regard, there was a discussion about the FTC. The Court is aware of this, so I will just point this out. Unlike what the Supreme Nonbinding Singular Letter that it referenced, the FTC canvassed the issue, canvassed all of their guidance over 40 years. So we would respectfully assert that when... The FTC didn't do it. A staff attorney did. Correct, Your Honor. I apologize. We're not finding authoritative guidance about what some unidentified, well, may have been identified. The staffer wrote in a summary report that the FTC says, or the report says, this isn't binding. And then just to respond to the no harm, we obviously disagree that there's no harm. She had inquiries on her credit report. There was expert testimony that each inquiry on a she didn't testify that she had any harm, but that's in the record. I would just leave the Court with this, since I know that my time is up. In addition to the plain reading that we've outlined, the FTC's guidance, or at least information, I would leave the Court with this. The purpose of the Fair Credit Reporting Act is to promote accuracy in credit reports and the fair and equitable use of credit reports. How does not investigating the disputes of someone who's been the victim of identity theft, who has had their name already run through the mud, and they got all these inquiries on their credit report that now lowers their score, how does the failure to investigate further that? It doesn't. Thank you very much. Thank you, counsel. I don't often do this. I haven't done it in four or five sittings, but I want to tell you, if you want a decision, we'll give you a decision, but it seems to me this case really needs to be settled. And on both sides, for example, Mr. Francis, I don't know what my colleagues are myself, so I'm speaking not about the decision that's coming down, but the decision you might face. You may lose everything. Client gets nothing. You don't get any attorney's fees. All you get is some free litigation experience, except it's not free. It's costing you money. It is not free, right? It's not free. As I understand it, you face the whole industry crashing down around you, and everybody's going to say, who let that happen? I can't tell you how we're going to rule. I don't even know how I'm going to rule, much less we don't talk about these cases before we hear oral argument, so I don't know. But you have every good reason to settle this case. Because if you don't, you face at least the prospect of losing on the merits, which I understand from you would be worse even than the willful determination in this one case involving one consumer. And it would certainly, willful determination would certainly incorporate the loss across the board. It doesn't have to be that way. You all can get together with our mediator's office and talk about these things and see if you can't make some settlement that's a compromise or not a compromise. Doesn't bother me which way. We don't find out how it's settled. I repeat, there is no compulsion, forcible or otherwise, from the earlier case. There's no compulsion for you to say, we'll be glad to, that's what we do. We'll issue a decision. It just seems to me like it would be unfortunate if the opportunity to settle, and I know you've been to mediation. I know how our mediation office works. But sometimes they tell me that after oral argument, parties are more willing to settle than before. So, I'll get an order out, just a standard order, sending you all to mediation and I hope you'll settle. But if you issue a decision in due course after that, they'll notify us that the efforts have not been successful and we'll go forward from that. Any questions about that process or anything? No, I appreciate that, your honor. Okay, good. Thank you. Thank you all. We're going to take a recess, short recess here, reconstitute the court. We'll be back in about 10 minutes.